Mark A. SCHNURR and Sharilyn K. Schnurr, individually and as parents of Valeen M. Schnurr, Ashley L. Schnurr and Samantha G. Schnurr, and Valeen M. Schnurr, Ashley L. Schnurr and Samantha G. Schnurr, individually, Dale C. Todd and Jana M. Todd, individually and on behalf of Evan M. Todd, Brian W. Todd, Adam C. Todd, and Carl J. Todd, and Evan M. Todd, Brian W. Todd, Adam C. Todd, and Carl J. Todd, individually, Andrew M. Park and Michelle H. Park, individually and as parents of Jeanna A. Park and Kathy H. Park, and Jeanna A. Park and Kathy H. Park, individually, Plaintiffs,

v.

The BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, the Sheriff's Department of Jefferson County, Sheriff John Stone, Deputy Sheriff Neil Gardner, Deputy Sheriff Paul Magor, Deputy Sheriff Paul Smoker, Deputy Sheriff Scott Taborsky, Deputy Sheriff Rick Searle, Deputy Sheriff Kevin Walker, Undersheriffs, Deputy Sheriffs, Other Employees of the Sheriff's Department of Jefferson County John Does 1 Through 30, Defendants.

No. CIV.00–B–790.

United States District Court, D. Colorado.

Nov. 27, 2001.

Daniel E. Evans, Godin & Baity, LLC, Kim Eves Ikeler, Jay S. Horowitz, Philip Lance Gordon, Horowitz & Wake, Denver, CO, for Plaintiffs.

J. Andrew Nathan, Andrew J. Fisher, Bernard Roland Woessner, Nathan, Bremer, Dumm & Myers, PC, Denver, CO, William A. Tuthill, III, Lily Wallman Oeffler, County Attorney's Office, Golden, CO, Alan Kaminsky, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Defendants.

## MEMORANDUM OPINION and ORDER

BABCOCK, Chief Judge.

Defendants The Board of County Commissioners of Jefferson County (the Board), The Sheriff's Department of Jefferson County (Sheriff's Department), Sheriff John Stone, Deputy Sheriff Neil Gardner, Deputy Sheriff Paul Magor, Deputy Sheriff Paul Smoker, Deputy Sheriff Scott Taborsky, Deputy Sheriff Rick Searle, and Deputy Sheriff Kevin Walker (collectively, Deputy Sheriff Defendants) move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all claims brought by Plaintiffs Mark A. Schnurr, Sharilyn K. Schnurr, Valeen M. Schnurr, Ashley L. Schnurr, Samantha G. Schnurr, Dale C. Todd, Jana M. Todd, Evan M. Todd, Brian W. Todd, Adam C. Todd, Carl J. Todd, Andrew M.

Park, Michelle H. Park, Jeanna A. Park, and Kathy H. Park. After consideration of the motion, briefs, arguments of counsel, and for the following reasons, I grant the motion.

## I.

### Facts

The following facts are alleged in Plaintiffs' Second Amended Complaint. (Complaint). On April 20, 1999, Plaintiffs Valeen M. Schnurr, Evan M. Todd, and Jeanna Park were shot and seriously wounded in Columbine High School's library (Library) by fellow students Eric Harris and Dylan Klebold. *See* C/O ¶¶ 56, 57. Kathy Park, Jeanna Park's sister, was also in the Library and witnessed her sister being shot and wounded and other students being wounded and killed. *Id.* at ¶ 57. The wounded Plaintiffs and Kathy Parks will be referred to, collectively, as the Library Plaintiffs. The following events led up to these shootings.

On the morning of April 20, 1999, Columbine High School Dean Peter Horvath called School Resource Officer Defendant Deputy Sheriff Gardner for his assistance, informing him that there had been a shooting. C/O ¶ 16. Deputy Gardner responded by driving his patrol car to the "senior parking lot," located just south and west of the Library, and parked. *Id.* at ¶¶ 17, 21. The Library is located on the upper level, directly above the school cafeteria. *Id.* Because the school is located on sloping terrain, the Library's exterior entrance is at ground level even though the Library itself is on the upper level. *Id.*

Upon his arrival, Deputy Gardner saw several wounded students lying on the ground outside the school. Plaintiffs allege that based on his experience as the School Resource Officer, Deputy Gardner was aware that the Library would be filled with students at that time, approximately 11:18 a.m., which corresponded with one of the school's lunch periods. *Id.* at ¶ 23. From his vantage point, Deputy Gardner observed that the Library's exterior entrance door was open. *Id.*

Almost immediately, Deputy Gardner saw either Harris or Klebold, likely Klebold, near the school's west entrance, approximately thirty (30) feet east of the Library's exterior entrance door. *Id.* at ¶¶ 24, 20. Deputy Gardner saw that Klebold was holding a dark-colored long rifle. *Id.* at ¶ 24. Klebold fired several shots at Deputy Gardner who then took cover behind his patrol car. When the deputy looked again, Klebold had entered the school. *Id.*

Shortly after Deputy Gardner's arrival at Columbine, Deputy Smoker and Deputy Taborsky arrived and parked their patrol car in the vicinity of Deputy Gardner's car. C/O ¶ 26. Upon their arrival, Deputy Smoker and Deputy Taborsky saw wounded students on the grass and on the sidewalk leading towards Columbine's west entrance. *Id.* These deputies also noticed that the exterior entrance to the Library was open. *Id.*

Deputies Gardner, Smoker, and Taborsky heard gunshots and explosions inside the school. C/O ¶ 27. Students running out of school told Deputies Smoker and Taborsky that two gunmen were shooting students. *Id.* None of the students reported that Harris and Klebold had taken or were threatening to take hostages. *Id.* Deputy Smoker relayed the students' reports to Deputy Gardner who was nearby. *Id.*

Deputy Sheriffs Magor, Searle, and Walker then arrived at the senior parking lot where they learned what the other deputies had seen. C/O ¶ 28. They saw the wounded students on the ground, saw students fleeing from the school, and

heard automatic gunfire coming from inside Columbine. *Id.*

Allegedly, based on their own observations and the reports they received from Dean Horvath and the fleeing students, the six Deputy Sheriff Defendants knew they were confronting a "high-risk" situation rather than a hostage situation as defined by the Jefferson County Sheriff's Department's Manual. C/O ¶ 29.

These Deputy Sheriff Defendants were in contact with the Sheriff's Department, Sheriff Stone, and other deputy sheriffs and employees immediately upon their arrival at the senior parking lot. C/O ¶ 30. The Sheriff's Department also began receiving emergency telephone messages routed through its communications center 911 operator. *Id.* In response, the Sheriff's Department cleared its main communications channel and all other radio traffic was routed to secondary radio channels. *Id.* at ¶ 31. This permitted Sheriff Stone and others in command, including Deputy Gardner, to communicate directly with the deputies at an en route to the school to monitor and receive information about the 911 telephone calls being received. *Id.* The Sheriff's Department put out a statewide callover the state law enforcement Colorado Law Enforcement Emergency Response Network (CLEER) channel to other law enforcement jurisdictions for "mutual aid." C/O ¶ 32.

Minutes after the Deputy Sheriff Defendants arrived at Columbine, a four-member Denver special weapons and attack (SWAT) team also arrived. C/O ¶ 33. These officers, trained to handle high-risk situations, allegedly were prepared and willing to use their special weapons and tactics in response to the Columbine attack. *See id.*

As the Denver SWAT team pulled into sight of Columbine's west entrance and the Library's exterior entrance, they saw Harris or Klebold, likely Harris, pointing a long-barrel weapon out of the west entrance doors. Harris fired a number of rounds. Three of the SWAT team members returned fire, each getting off several rounds. C/O ¶ 38. Following this exchange, Harris withdrew into the school. *Id.* The three SWAT team members advanced toward the school in the direction of the Library's exterior entrance and the school's west entrance. *Id.* at ¶ 40. The Denver SWAT team did not, however, enter Columbine High School due to the following actions of the Deputy Sheriff Defendants. *Id.*

The Deputy Sheriff Defendants enforced Sheriff Stone's order and/or the Board's and the Sheriff Department's custom, policy or practice calling for the establishment of a secure perimeter after classifying the Columbine attach as a high-risk situation. *See* C/O ¶ 43. A "secure perimeter" is intended to prevent anyone from entering the scene and to prevent the perpetrators of the high-risk situation from escaping. *Id.*

Allegedly, consistent with this order to secure the perimeter of Columbine High School, the Deputy Sheriff Defendants "issued orders that they would not permit law enforcement officers, whether affiliated with the Sheriff's Department, or like the Denver SWAT team, affiliated with separate law enforcement agenc[ies], to enter the school to attempt a rescue." C/O ¶ 44. The two shooters, Harris and Klebold, demonstrated no intention other than to remain in the high school and injure or kill as many students and teachers as possible. *See id.*

As a result, and as part of the decision not to attempt a rescue themselves and to prevent anyone else from attempting a rescue, the Deputy Sheriffs ordered the Denver SWAT team to halt its advance towards the high school and to cease any other rescue efforts. C/O ¶ 45.

In the meantime, after entering the school building, Harris and Klebold fired upon and wounded students and teachers. Among those wounded near the school's west entrance was teacher Patti Nielson. C/O ¶ 47.

After being wounded by gunfire Ms. Nielson fled down a hallway to the Library where a number of students, including the Library Plaintiffs, were studying. Immediately upon entering the Library, Ms. Nielson yelled at the students that there was a "kid with a gun" and to get down. C/O ¶ 48. She then telephoned the 911 operator at the Sheriff's Department. Ms. Nielson informed the 911 operator that: 1) she had been "hit;" 2) a student who had been standing beside her when she first saw Harris and Klebold also had been "hit;" 3) she was in the Library; and 4) Harris and Klebold were in the hallway outside the Library. *Id.* The 911 operator could hear Harris' and Klebold's gunfire over the telephone. Ms. Nielson informed the 911 operator several times that the gunshots she and the operator were hearing were in the hallway just outside the library door. *Id.* The 911 operator then routed the information received from Ms. Nielson to the Deputy Sheriffs on scene and to Sheriff Stone. C/O ¶ 49. According to Plaintiffs, there was "ample time to safely evacuate the students from the Library, or for the students to safely evacuate themselves, before Harris and Klebold entered the Library." C/O ¶ 50. It is alleged further that the Deputy Sheriff Defendants could see that the Library's exterior entrance was open and knew that the students could "safely escape" from the library through this entrance, "probably in less than one minute." *Id.*

Sheriff Stone and the Deputy Sheriff Defendants did not order or effectuate an evacuation. C/O ¶ 51. Instead, the Deputy Sheriff Defendants remained outside while the 911 operator, based on her train-ing and/or responding to the direction of Sheriff Stone and the Sheriff's Deputies assured Ms. Nielson that help was on the way: "We have paramedics, we have fire, we have police en route, okay?" *Id.* The 911 operator also instructed Ms. Nielson to "keep everyone low to the floor." *Id.* Ms. Nielson passed on this instruction to the students in the Library. *Id.*

Allegedly, the Library Plaintiffs understood that Ms. Nielson was conveying the Sheriff's Department's instructions concerning the best way to protect themselves from danger. C/O ¶ 53. According to the Complaint, these Plaintiffs also understood the instructions to mean that if they stayed in the Library, law enforcement officers would soon arrive and rescue them. *Id.* The Library Plaintiffs allege that in reliance on the Sheriff's Department's instructions, they remained in the Library. As a result, the Library Plaintiffs "made no effort to protect themselves, in particular by using the readily accessible escape route from the library to the outside." *Id.*

At some point, Harris and Klebold entered the Library. The 911 operator heard Harris' and Klebold's voices and gunfire through the telephone handset which Ms. Nielson had placed on a table. C/O ¶ 55. Harris or Klebold fired a shot wounding Plaintiff Evan Todd. *Id.* at ¶ 56. Harris and Klebold then fired upon other students, killing some and wounding others, including Plaintiffs Jeanna Park and Valeen Schnurr. *Id.* at ¶¶ 56–57. Plaintiff Kathy Park saw her sister Jeanna being shot and witnessed other students being wounded and killed. *Id.* at ¶ 57.

The Deputy Sheriff Defendants never provided the assistance promised by the 911 operator, C/O ¶ 54, or made any effort to rescue the students. *Id.* at ¶ 58. Rather, they maintained their "secure perimeter" response by continuing to prevent the

Denver SWAT team and other potential rescuers from entering the school building. *Id.* at ¶¶ 54, 58.

Eventually, Harris and Klebold left the Library. Within a minute or two of their departure, those students able to walk made their way out of the Library through the exterior entrance. C/O ¶ 59.

Valeen Schnurr, who was seriously wounded and bleeding heavily, was assisted to the car of an unknown deputy sheriff. C/O ¶ 60. It is alleged that this deputy sheriff told her to wait for the next car. *Id.* Schoolmates then assisted her into a second unknown deputy sheriff's car. The second deputy sheriff then took Ms. Schnurr to a third unknown deputy sheriff's car. *Id.* The third deputy sheriff handed Ms. Schnurr over to civilians driving a golf cart. *Id.* These persons transported Ms. Schnurr to a vehicle operated by a police officer. *Id.* This police officer recognized the seriousness of her condition and provided first aid until an ambulance arrived. *Id.* Ms. Schnurr lost a great deal of blood during the thirty (30) to forty-five (45) minutes she was required to wait for care. *Id.* Upon arrival at the hospital, medical personnel and attendants were unsure she would survive. *Id.*

Jeanna Park was the last student to escape from the school library. C/O ¶ 61. Kathy Park assisted Jeanna Park to a deputy sheriff's car, behind which the sisters hid. *Id.* Thereafter, an unknown deputy sheriff took them to another area without administering first aid. Jeanna Park, the last of the wounded taken to a hospital, received no medical assistance from the Sheriff's Department during the time she waited for an ambulance. *Id.*

## II.

### Claims

Plaintiffs bring the following claims based on the foregoing allegations:

### *Claim One*

Deprivation of Constitutional Right to Life, Liberty and Personal Security under 42 U.S.C. § 1983—"State–Created and State–Enhanced Danger"—All Plaintiffs against the Jefferson County Board of County Commissioners, Jefferson County Sheriff's Department, all Deputy Sheriffs in their individual capacities, and against Sheriff John Stone, in his official capacity.

### *Claim Two*

Deprivation of Constitutional Right to Life, Liberty and Personal Security under 42 U.S.C. § 1983—"Special Relationship—All Plaintiffs against the Jefferson County Board of County Commissioners, Jefferson County Sheriff's Department, all Deputy Sheriffs in their individual capacities, and against Sheriff John Stone, in his official capacity."

### *Claim Three*

Failure to Provide Medical Assistance under 42 U.S.C. § 1983 by the Schnurr and Park Plaintiffs against the Jefferson County Board of County Commissioners, the Jefferson County Sheriff's Department, Unknown Deputy Sheriffs, in their individual capacity, and Sheriff Stone, in his official capacity.

### *Claim Four*

Willful and Wanton Conduct—All Plaintiffs against Deputy Sheriffs and Sheriff Stone, in their individual capacity.

### *Claim Five*

Outrageous Conduct—All Plaintiffs against Deputy Sheriffs and Sheriff Stone, in their individual capacity.

Plaintiffs do not plead separate claims for relief against the Jefferson County Board of County Commissioners, the Jefferson County Sheriff's Department, (collectively, Municipal Defendants) and Sheriff Stone, in his official capacity. Rather, in Claims One, Two, and Three,

the Plaintiffs allege that the Deputy Sheriff Defendants' actions were taken pursuant to policies or customs of the Municipal Defendants. *See* C/O ¶¶ 70, 78, and 85. For clarity of analysis, I analyze separately the claims brought against the Deputy Sheriff Defendants and the claims asserted against the Municipal Defendants and Sheriff Stone, in his official capacity as a policymaker for the Sheriff's Department.

All Defendants move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the federal claims for failure to state claims upon which relief can be granted. Further, the Deputy Sheriff Defendants, accepting as true Plaintiffs' well pleaded facts, assert entitlement to qualified immunity from suit as to the § 1983 claims. They also seek dismissal of Claim Four as barred by the Colorado Governmental Immunity Act, § 24–10–101, *et seq.*

### III.

### Fed.R.Civ.P. 12(b)(6)

Under Rule 12(b)(6), I may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pleaded facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* I accept "as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party." *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir.1998). All reasonable inferences must be construed in the plaintiff's favor. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir.1998). *Id.* A plaintiff's conclusory allegations need not be accepted as true. *Southern Disposal, Inc. v. Texas Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir.1998).

### IV.

### Qualified Immunity

The Deputy Sheriff Defendants maintain they are entitled to qualified immunity from the first, second, and third claims under 42 U.S.C. § 1983 because the contours of the pertinent law were not clearly established on April 20, 1999.

The basic principles of qualified immunity are well settled. The purpose of a qualified immunity defense under § 1983 is to limit the deleterious effects that the risks of civil liability would otherwise have on government operations at all levels, federal, state, and local. *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Discretionary decisions by government actors inevitably impact the lives of private individuals, sometimes with harmful effects. Moreover, such decisions are inescapably imperfect. Especially in the context of police work, decisions must be made in an atmosphere of great uncertainty. Holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement. *See Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir.1998); *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991). Qualified immunity thus allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Qualified immunity under § 1983 shields officials from civil liability unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The linchpin of qualified immunity is objective reasonableness. *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034. So long as the officer's actions, viewed from the perspective of the officer at the time, can be seen to be within the range of reasonableness, then no liability will attach. *See id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted." Id.* at 640, 107 S.Ct. 3034. (emphasis added).

■ Important to this reasonableness inquiry is whether the rights alleged to have been violated were clearly established at the time of the challenged actions. *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. If the law supporting the allegedly violated rights was not clearly established, then immunity must lie. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034; *Tarantino v. Baker,* 825 F.2d 772, 774 (4th Cir.1987). Where the law is clearly established, and where no reasonable officer could believe he was acting in accordance with it, qualified immunity will not attach. The purpose of this doctrine is to ensure that police officers and other government actors have notice of the extent of constitutional restrictions on their behavior. *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Thus, qualified immunity prevents officials from being blindsided.

■ In a § 1983 suit for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *See Saucier v. Katz,* 533 U.S. 194, 199–201, 121 S.Ct. 2151, 2155–56 (2001). Qualified immunity

is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* As a result, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

■ In *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court clarified the appropriate framework for reviewing qualified immunity from § 1983 substantive due process claims. Under *Siegert,* I must first determine whether Plaintiff "has asserted a violation of a constitutional right at all." *See id.* at 232, 111 S.Ct. 1789. If Plaintiff has asserted the violation of a constitutional right, then I determine whether that right was clearly established so that reasonable officials in Defendants' situation would have understood their conduct violated that right. *See Liebson v. New Mexico Corrections Dept.,* 73 F.3d 274, 276 (10th Cir.1996); *Martinez v. Mafchir,* 35 F.3d 1486, 1490 (10th Cir.1994).

Following the *Siegert* framework, I must first decide whether Plaintiffs have properly asserted the violation of constitutional rights in Claims One, Two, and Three.

## V.

### Substantive Due Process42 U.S.C. § 1983 Jurisprudence

**A. Fourteenth Amendment—Due Process Clause**

■ The Fourteenth Amendment to the United States Constitution explicitly guarantees to each citizen that no state shall

"deprive any person of life, liberty, or property, without due process of law...." U.S. Const., amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment guarantees the right of appropriate procedural process, not implicated in this case, before a state can act to deprive an individual of his or her life, liberty, or property. The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

## B. 42 U.S.C. § 1983

The vehicle through which a violation of substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution is remedied is 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

This section, enacted in its original form in 1871, was specifically designed to provide a method for redress of violations of the rights protected under the Fourteenth Amendment by *state actors*. As described by the United States Supreme Court, § 1983 developed in the following manner:

> As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Govern-

ment as guarantor of basic federal rights against state power was clearly established.... Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.

> \* \* \* \* \* \*

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."

*Mitchum v. Foster*, 407 U.S. 225, 238–40, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

 While implemented to provide a method of redress for the deprivation of life, liberty or property by state action, neither § 1983 nor the Fourteenth Amendment transform mere tortious acts into constitutional violations. *Daniels*, 474 U.S. at 332, 106 S.Ct. 662. Instead, the Fourteenth Amendment protects citizens from the arbitrary, abusive, or oppressive use of governmental power. *Id.* This basic principle of due process jurisprudence dictates that the Fourteenth Amendment does not confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

## C. *DeShaney* Decision

 In *DeShaney*, the Supreme Court announced the now firmly entrenched rule that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect

individuals from private violence. *See id.* at 195–97, 109 S.Ct. 998. In *DeShaney,* the Winnebago County Department of Social Services (the County) received numerous reports that Joshua, a small child, was being abused by his father. *Id.* at 192–93, 109 S.Ct. 998. Joshua, temporarily removed from his father's custody, was soon returned to his father's care. *Id.* The County continued to receive reports that Joshua was being abused but failed to act. *Id.* Eventually, Joshua's father beat him so severely that he suffered permanent brain damage. *Id.* Joshua and his mother sued the County and several of its employees, alleging that the County had violated the Substantive Due Process Clause of the Fourteenth Amendment by failing to intervene on his behalf and protect him from his father's abuse. *Id.*

The *DeShaney* Court rejected plaintiffs' argument that the County acquired an affirmative obligation to protect Joshua from his father's abuse based on the fact that the County was aware of the alleged abuse. *Id.* at 195, 109 S.Ct. 998. Relying on the premise that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protects them from each other," the Court held that:

> [N]othing in the ... Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Consistent with these principles, ... the Due Process Clause[ ] generally confer[s] no affirmative right to

governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual. *Id.* at 195–96, 109 S.Ct. 998. The principle that there is no constitutional right to police protection is derived from well settled jurisprudence addressing the purposes of the Fourteenth Amendment and 42 U.S.C. § 1983, the statutory provision providing a remedy for violations of the Constitution.

The Tenth Circuit has gleaned two exceptions to *DeShaney's* general rule that a state is not constitutionally obligated to protect individuals against private violence: 1) the special-relationship doctrine, and 2) the state-created or enhanced danger doctrine. *See Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996).

### 1. Special Relationship Doctrine

■ The special-relationship doctrine stems directly from *DeShaney* itself, and applies in situations where the state imposes limitations upon an individual's freedom to act on his or her own behalf:

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty*—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. 998 (emphasis added); *see also City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (duty to provide medical care to injured suspects in police custody); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (duty to protect involuntarily com-

mitted mental patients from harm by themselves and others).

In the years following *DeShaney,* courts have struggled with the question of what restraint "similar" to incarceration or institutionalization is sufficient to give rise to a state's duty to protect. The Tenth Circuit has held that a plaintiff must show involuntary restraint by a government official in order to establish a duty to protect under the special relationship theory. *See Liebson,* 73 F.3d at 276 (librarian who was sexually assaulted while employed in a prison failed to show existence of special relationship because employment was voluntary).

■■■■ In *Graham v. Independent Sch. Dist. No. I-89,* 22 F.3d 991, 994–95 (10th Cir.1994), the Tenth Circuit held that schools have no duty under the Due Process Clause to protect students from assaults by other students, even when the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will the state assumes some measure of a constitutionally mandated duty of protection. *Id.* at 994. Compulsory attendance laws for public schools, however, do not create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school. *Id.,citing Maldonado v. Josey,* 975 F.2d 727, 732 (10th Cir.1992), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993). Inaction by the state in the face of a known danger is not enough to trigger a constitutional duty to protect unless the state has a custodial or other "special relationship" with the victim. *See Graham,* 22 F.3d at 995. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament ... but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998; *Seamons v. Snow,* 84 F.3d 1226,

1235–36 (10th Cir.1996), *reversed in part on other grounds,* 206 F.3d 1021 (10th Cir.2000). Moreover, a defendant's knowledge of the risk of harm is not relevant to the determination of whether a special relationship existed. *See Graham,* 22 F.3d at 994 ("foreseeability cannot create an affirmative duty to protect" under the special relationship doctrine "when plaintiff remains unable to allege a custodial relationship"). Indeed, inaction by the state in the face of a known danger will not trigger the constitutional duty to protect. *Id.* at 995 *citing Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993).

## 2. State–Created or Enhanced Danger Doctrine

In its reasoning, the *DeShaney* Court also planted the seed for the second exception to the general rule that the state has no duty to protect citizens from private violence known as the state-created or enhanced danger doctrine:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*

*DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 (emphasis added).

Courts have also grappled with the question of what state conduct "creates or enhances" danger sufficient to establish a duty to protect. In *Medina v. City and County of Denver,* 960 F.2d 1493 (10th Cir.1992), the Tenth Circuit explained that police officers who engaged in a high speed car chase that resulted in injuries to a bicyclist could be liable for creating a special danger faced by the bicyclist. *Id.* at 1495–99.

The Tenth Circuit also addressed directly the state-created or enhanced danger doctrine in *Graham,* 22 F.3d at 994, con-

cerning acts of violence at two schools. At one school, a student was shot and killed by another student. At the other school, a student was stabbed by a fellow student. The students' parents brought separate § 1983 actions against their respective School Districts which were consolidated on appeal.

The *Graham* Court noted that *"DeShaney* ... le[ft] the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger," *citing Reed,* 986 F.2d at 1125 and *Dwares v. City of New York,* 985 F.2d 94, 99 (2nd Cir.1993). Citing *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), the Court stated that "[this state-created danger] doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Graham* at 995. Based in part on the plaintiffs' failure to point to any affirmative actions by defendants that created or increased the danger to the victims, the Court affirmed the district court's dismissal of the plaintiffs' complaints.

The contours of this doctrine were further explored in *Uhlrig,* 64 F.3d 567 in which the husband of a therapist killed by a mental hospital patient filed a § 1983 action asserting that the state's decision to terminate a special unit created the danger that led to his wife's death. The *Uhlrig* Court articulated a five-part test to determine whether a defendant created or enhanced the danger for the plaintiff: 1) whether plaintiff was a member of a limited and specifically definable group; 2) whether defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) whether the risk to plaintiff was obvious or known; 4) whether defendant acted recklessly in conscious disregard of that risk; and 5) if such conduct, when viewed in total,

"shocks the conscience" of federal judges. *Id.*

To bring the *Uhlrig* test in line with *DeShaney,* the Tenth Circuit later held in *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253 (10th Cir.1998) that "in addition to meeting *Uhlrig's* five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased the danger in some way." *Id.* at 1263; *accord Sutton v. Utah State School for the Deaf and Blind,* 173 F.3d 1226, 1238 (10th Cir.1999) (noting that danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger"). If, however, a plaintiff is unable to meet the five *Uhlrig* requirements, a court need not reach the question of the state's role in causing or enhancing the danger to the plaintiff. *Armijo,* 159 F.3d at 1263, fn. 6.

I address Plaintiffs' claims in light of these controlling legal principles.

## VI.

### Claims Analysis

**A. Section 1983 Claims against the Deputy Sheriff Defendants**

1. ***Claim One*—42 U.S.C. § 1983–Deprivation of Constitutional Right to Life, Liberty and Personal Security under 42 U.S.C. § 1983— "State–Created and State–Enhanced Danger"—All Plaintiffs against all Deputy Sheriffs in their individual capacities**

The Deputy Sheriff Defendants move to dismiss Claim One in which Plaintiffs assert a substantive due process violation based on alleged improper responses to the Columbine attack and lack of rescue efforts by these Defendants. For the following reasons, I grant the motion.

Plaintiffs allege the following alleged improper responses to the Columbine attack and lack of rescue efforts by the Deputy Sheriff Defendants:

¶ 43. Upon information and belief, the Deputy Sheriffs ... determined that they would not attempt to evacuate anyone from the school, including the students in the library, that they would not pursue Harris and Klebold or to attempt a rescue.... [T]he Deputy Sheriffs, upon information and belief, decided to enforce [Sheriff] Stone's order ... which called for deputy sheriffs encountering a "high-risk" situation to merely establish a "secure perimeter" around the area under attack. The "secure perimeter" is intended to prevent anyone from entering the school and to prevent the perpetrators of the "high-risk" situation from escaping.

¶ 44. Consistent with their decision, the Deputy Sheriffs, upon information and belief, issued orders that they would permit no law enforcement officers, whether affiliated with the Sheriff's Department or, like the Denver SWAT team, affiliated with a separate law enforcement agency, to enter the school to attempt a rescue. At the same time, they decided to attempt no rescue themselves....

¶ 45. As a result of, and as part of the decision not to attempt a rescue themselves and to prevent anyone else from attempting to rescue, upon information and belief, the Deputy Sheriffs ordered the Denver SWAT team to halt its advance towards the school and to cease any other rescue efforts.

¶ 48. Ms. Nielson, [a wounded teacher], fled down a hallway to the library, where a number of students, including Valeen Schnurr, Evan Todd, Jeanna A. Park and Kathy Park, were studying. Immediately upon entering the library, Ms. Nielson yelled at the students that there was a "kid with a gun" and to get

down. She then telephoned the 911 operator at the Sheriff's Department. Ms. Nielson told the 911 operator that she had been "hit," that a student who had been standing beside her when she first saw Harris and Klebold also had been "hit," that she was in the library and that Harris and Klebold were in the hallway outside the library. The 911 operator could hear Harris' and Klebold's gunfire over the telephone line. Ms. Nielson informed the 911 operator several times that the gunshots she and the 911 operator were hearing were in the hallway just outside the library door.

¶ 49. Upon information and belief, the 911 operator routed Ms. Nielson's information and cry for help to the Deputy Sheriffs on the scene and to [Sheriff] Stone....

¶ 51. Nonetheless, the Deputy Sheriffs and [Sheriff] Stone did not order or effectuate an evacuation, [despite knowing that the library's exterior entrance was open]. *See* C/O ¶ 50. Instead, the Deputy Sheriffs remained outside the library while the 911 operator, based on her training and/or responding to the direction of [Sheriff] Stone or the Deputy Sheriffs, assured Ms. Nielson that help was on the way: "We have paramedics, we have fire, we have police en route, okay?" The 911 operator also instructed Ms. Nielson "to keep the students in the library and to have them lie on the floor" "Keep everyone low to the floor," the 911 operator instructed Ms. Nielson. Ms. Nielson passed on these instructions to the students in the library.

¶ 53.... As a result, plaintiffs made no effort to protect themselves, in particular, plaintiffs did not avail themselves of the readily accessible escape route from the library to the outside where the Denver SWAT team was available to

provide cover for, and assist them in, their escape.

¶ 54. Even after the Deputy Sheriffs learned from the 911 operator that Harris and Klebold were outside the library, and even though the Deputy Sheriffs knew that the 911 operator—in accordance with standard operating procedure and/or pursuant to their or [Sheriff] Stone's directions—was instructing the students to remain in the library because help was on the way, the Deputy Sheriffs maintained their "secure perimeter" response. The Deputy Sheriffs never provided the assistance promised by the 911 operator. Upon information and belief, the Deputy Sheriffs continued to prevent the Denver SWAT team and any other potential rescuers from entering the school.... The Deputy Sheriffs placed plaintiffs in a position where plaintiffs could not help themselves and, concurrently, plaintiffs were denied the help of others.

Second Amended Complaint, *passim.*

In moving to dismiss Claim One, the Deputy Sheriff Defendants contend that Plaintiffs fail to allege circumstances or conduct meeting the second, fourth, and fifth elements of the *Uhlrig* test. *See* Opening Brief, p. 23. Footnote 37, however, casts doubt on whether the Deputy Sheriff Defendants are conceding the first and third element. Out of an abundance of caution, I examine each *Uhlrig* element.

### a. *Uhlrig* Test—First Element—Limited and Specifically Definable Group

■ Plaintiffs allege that the Deputy Sheriff Defendants knew that there were a number of Columbine students in the Library along with a teacher, Ms. Nielson. *See* ¶¶ 27, 49. This information defines a limited and specific group—Columbine High School students and one teacher in the school library versus those Columbine

students and teachers not in the Library. Thus, this element has been met.

### b. *Uhlrig* Test–Second Element—Substantial Risk of Serious, Immediate and Proximate Harm

Relying on *Armijo* and *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226 (10th Cir.1999), the individual Sheriff Defendants contend that it was Harris' and Klebold's conduct rather than their own that put the Library Plaintiffs at risk of serious, immediate and proximate harm. *See* Opening Brief, pp. 23–24.

Pursuant to *Armijo* and *Sutton,* Plaintiffs must allege that the Deputy Sheriff Defendants affirmatively placed the Library Plaintiffs in the path of substantial risk of serious, immediate and proximate harm.

In *Armijo,* the parents brought suit against a school and several individually named school employees when, after being suspended and driven home without parental notification, their son Philadelphio committed suicide. Plaintiffs' son, a special education student, repeatedly had expressed suicidal thoughts and at least one of the individual defendants knew that Philadelphio had access to firearms at his home. The suicide was immediately preceded by the decision of the principal, Mary Schutz, and school counselor, Tom Herrera, to suspend Philadelphio. Contrary to stated school policy, without contacting Philadelphio's parents, and despite his known suicidal ideation and access to firearms, Ms. Schutz directed Mr. Herrera to remove Philadelphio from the school grounds and drive him home, even though they both knew Philadelphio's parents were not home. Philadelphio shot himself at home after Mr. Herrera dropped him off and before his parents returned home. *See Armijo,* 159 F.3d at 1256–1257.

In affirming denial of summary judgment as to two defendants, the *Armijo* court emphasized that the defendants must have actually placed the Plaintiff in harms way, stating that:

> [t]he key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the *third party's [acts] to occur.*

*Armijo*, 159 F.3d at 1263. Furthermore, according to *Armijo*, "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Armijo*, 159 F.3d at 1263.

In *Sutton*, the victim, James Sutton, who suffered from severe cerebral palsy, mental retardation, total blindness and the inability to speak, communicated to his mother that he was being inappropriately touched by another boy at school. James' mother complained to the school, which took no action other than to promise to constantly supervise James in the bathroom. On an occasion when James was using the bathroom, a teacher's aide abandoned her monitoring post to answer a telephone. When she returned, she found James being molested by another student. *Sutton*, 173 F.3d at 1230–1231.

In affirming dismissal of the complaint against the defendant teacher, the Court stated that "Moore [the teacher] himself did not personally, affirmatively place James in any danger." *Sutton*, 173 F.3d

at 1239. The Court then compared Moore's actions to the teacher aide's actions, who was not a named defendant, stating that it was the teacher's aide who "affirmatively placed James in danger by leaving him to answer the phone," thus, rendering James vulnerable to the attack. *Id.*

In *Sutton*, the Court affirmed dismissal of Plaintiff's "danger creation" claim because the named defendant did not personally affirmatively act to create or enhance the danger to the victim. *See id.* at 1239. Here, the Sheriff Defendants are alleged to have issued multiple orders refusing to permit any access to or rescue of the Library Plaintiffs. *See e.g.*, C/O ¶¶ 43–45, 51, 54. In addition, Plaintiffs allege that the Sheriff Defendants, through communications with the 911 operator, told the persons in the library to stay down and assured them that help was on the way. C/O ¶¶ 51, 53.

Plaintiffs allege that based on these assurances the Library Plaintiffs did not leave the Library by the open exterior entrance, a readily accessible escape route. *Id.* at 53. Simultaneously, the Deputy Sheriff Defendants cut off all avenues of outside aid by refusing to permit the SWAT team to attempt to rescue those in the Library. Consequently, the Library Plaintiffs contend they lost their window of opportunity to escape from the Library.

The Deputy Sheriff Defendants rely on the *Armijo* Court's holding that "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *See Armijo*, 159 F.3d at 1263. In *Armijo*, however, the injuries to the victim were self-inflicted and did not involve the acts of a third-party. Based on these circumstances the *Armijo* Court ad-

dressed liability only under the danger creation theory, not, as in this case, the danger enhancement theory. *See Dwares*, 985 F.2d at 99. (Plaintiffs alleged that defendant officers advised skinheads that they could assault demonstrators without police interference. Under these circumstances, "defendant officers indeed had made the demonstrators more vulnerable to assaults."). Therefore, *Armijo* is arguably distinguishable because it did not address the specific theory of "danger enhancement." *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995), a decision upon which the Deputy Sheriff Defendants rely strongly, is also distinguishable. According to the *Pinder* majority, unlike in this case, Pinder's case was based purely on the defendant's failure to provide adequate protection from the danger created by another. Thus, the Court characterized Pinder's case as purely an "omission claim." In contrast, Claim One is based not only on the Deputy Sheriff Defendants' failures to act but also on their affirmatively instructing the Library Plaintiffs to stay down and assuring them that help was on the way.

Under the circumstances of this case, Plaintiff's allegations can be construed fairly to meet the second element of the *Uhlrig* test that the individual Sheriff Defendants' affirmative actions on April 20, 1999 enhanced the danger that the Library Plaintiffs would be attacked by Harris and Klebold.

#### c. *Uhlrig* Test–Third Element–Risk was Obvious or Known

Plaintiffs clearly allege the known and obvious danger that Harris and Klebold would attack the persons in the Library. Thus, Plaintiffs have met the requirements of the third *Uhlrig* factor.

#### d. *Uhlrig* Test–Fourth Element–Reckless Actions in Conscious Disregard of the Risk

The Deputy Sheriff Defendants contend that they did not act recklessly in conscious disregard of the risk that the Library Plaintiffs would be attacked by Harris and Klebold. In support, these Defendants point to their efforts to secure the perimeter around Columbine High School, the immediate response of SWAT officers, and the 911 operator's communications.

For a claim of recklessness to be cognizable under § 1983, the state actor must manifest either "1) an intent to harm; or 2) an intent to place a person unreasonably at risk of harm." *Uhlrig*, 64 F.3d at 573. The Due Process clause does not protect citizens "against incorrect or ill-advised [government] decisions." *Seamons*, 84 F.3d at 1236 *quoting Collins*, 503 U.S. at 120, 112 S.Ct. 1061.

The first type of recklessness conforms to the outlines of traditional intentional torts, while the second is defined as "when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and *unreasonable* disregard of the consequences.'" *Uhlrig*, 64 F.3d at 574 *quoting Medina v. City and County of Denver*, 960 F.2d 1493, 1496 (10th Cir.1992) (emphasis added). Based on the exigent circumstances facing the Deputy Sheriff Defendants, I conclude that Plaintiffs' allegations are insufficient to demonstrate that the Deputy Sheriff Defendants acted recklessly in conscious disregard of the risk that the Library Plaintiffs would be attacked by Harris and Klebold. Pursuant to *Uhlrig*, there are no factual allegations supporting the inference that these Defendants harbored an intent to harm the Library Plaintiffs. *See*

*id.* at 574. Moreover, in light of the rapidly developing and evolving crisis at Columbine and the inability to predict Harris' and Klebold's movements and reactions, I cannot conclude that the decisions made and implemented by the individual Sheriff Defendants were unreasonable. *See Medina,* 960 F.2d at 1496. Thus, this *Uhlrig* factor has not been met.

### e. *Uhlrig* Test—Fifth Element-"Conscience Shocking" Conduct

 The fifth *Uhlrig* element requires that a defendant's conduct, when viewed in total, must be "conscience shocking" to the court. To "shock the conscience," a plaintiff must do more than show that the government intentionally or recklessly caused injury to a plaintiff by abusing or misusing government power. The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. *Uhlrig,* 64 F.3d at 574. The *Uhlrig* Court acknowledged, however, that the level of culpability that must be shown under the "shocks the conscience" standard is difficult to define.

*County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) provides a gauge to assess conduct under this difficult standard. The Supreme Court cast the *Uhlrig* principles into a sound framework, grounded in common sense, for analyzing those myriad situations involving law enforcement and governmental workers deployed in emergency situations. The Court reiterated the important principle that rejects "the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct" and held "that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis,* 523 U.S. at 848–49, 118 S.Ct. 1708. The Court then observed that conscience-

shocking behavior is most likely to be found "at the other end of the culpability spectrum"—that is, where there is an intent to do harm that is not justified by any government interest. *Id.* at 849, 118 S.Ct. 1708. The *Lewis* Court further recognized that in the middle range of the culpability spectrum, where the conduct is more than negligent but less than intentional, there may be some conduct that is egregious enough to state a substantive due process claim. *See id.* at 849–50, 118 S.Ct. 1708.

Within this middle range, *Lewis* directs an examination of the circumstances surrounding the conduct at issue and the governmental interests at stake. The *Lewis* Court then points the inquiry to the official's opportunity for deliberation while drawing helpful analogies to the Eighth Amendment prison context. *See id.* at 850–55, 118 S.Ct. 1708 *citing, inter alia, Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *City of Revere,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605; *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. The marked differences between, for instance, a normal custodial situation in a prison and a violent disturbance in a prison demonstrates "why the deliberate indifference that shocks in the one case is less egregious in the other." *Lewis* at 852–53, 118 S.Ct. 1708. The "deliberate indifference" standard is only utilized when actual deliberation is practical. *Id.*

The Court looked to the level of culpability required for an Eighth Amendment violation in the prison context to the level required for substantive due process liability, instructing that the analysis rests upon:

> the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When

such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed."

*Id.* at 853–54, 118 S.Ct. 1708 *quoting Daniels,* 474 U.S. at 332, 106 S.Ct. 662. *Lewis* specifically analogized a prison official's response in a riot situation to a police officer's conduct in the high speed chase before it. Both situations require the officer's instant judgment, and, accordingly, no substantive due process claim can lie unless the defendant official's conduct was unjustified by any government interest and was "tainted by an improper or malicious motive." *Id.* at 855, 118 S.Ct. 1708.

 Therefore, in assessing the constitutionality of law enforcement actions, I must distinguish between emergency action and actions taken after opportunity for reflection. Appropriately, I must give great deference to the decisions that necessarily occur in emergency situations. With that caveat in mind, I look to the nature of the official conduct on the spectrum of culpability that has tort liability at one end; conduct in which the state actor intended to cause harm and in which the state lacks any justifiable interest on the other. In emergency situations, only conduct that reaches that far point will shock the conscience and result in constitutional liability. Where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience. *See also Radecki v. Barela,* 146 F.3d 1227 (10th Cir.1998), *cert. denied,* 525 U.S. 1103, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999) (sheriff's deputies had no time for deliberation in making instantaneous judgment call in suddenly explosive law enforcement situation; therefore no § 1983 claim based on substantive due process violation).

In determining this question, I am also mindful that courts must be " 'reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended.' " *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) *quoting Collins,* 503 U.S. at 125, 112 S.Ct. 1061. Courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]." *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. *See also Lewis,* 523 at 842, 118 S.Ct. 1708. Also, there is concern that § 1983 liability not replace state tort law and the need for deference to local policymakers in making decisions impacting upon public safety. *See Uhlrig,* 64 F.3d at 573. Moreover, the Due Process Clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Collins,* 503 U.S. at 129, 112 S.Ct. 1061.

 Plaintiffs allege that Deputy Gardner learned of the attack on Columbine at approximately 11:15 a.m. on April 20, 1999. C/O ¶ 16. When Deputy Gardner arrived at the senior parking lot approximately three minutes later, he spotted one of the attackers, likely Klebold, near an entrance to the school. *Id.* at ¶ 23. After firing several shots at Deputy Gardner, Klebold entered the school. *Id.* at ¶ 24. From Plaintiffs' allegations, I cannot determine the precise time that elapsed between the time Harris and Klebold entered the school building until they entered the Library and attacked the Library Plaintiffs. It is apparent from the allegations, however, that the elapsed time

was mere minutes. *See* C/O ¶¶ 47–49. During these minutes, the Deputy Sheriff Defendants heard gunshots and explosions inside the school. C/O ¶ 27. These circumstances are directly analogous to the prison riot discussed in *Lewis* during which state officials were forced to make "split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *See Lewis*, 523 U.S. at 853, 118 S.Ct. 1708. Under such circumstances, unless an intent to harm a victim is alleged, there is no liability under the Fourteenth Amendment redressable by an action under § 1983. *See id.*

Plaintiffs allege that the individual Sheriff Defendants "acted recklessly and in conscious and unreasonable disregard to the serious and immediate risk to the students in the library...." C/O ¶ 71. They allege further that the individual Sheriff Defendants' actions, and failures to act, constitute deliberate indifference to, and willful and callous disregard of, the constitutional rights ... of [the Library Plaintiffs]. *Id.* at ¶ 72. Plaintiffs do not allege that these Defendants acted with an intent to harm Plaintiffs. Therefore, there is no liability under the Fourteenth Amendment redressable by § 1983 action. *See Lewis*, 523 U.S. at 853, 118 S.Ct. 1708.

■■■ Assuming, *arguendo*, the proper standard were pleaded, under the totality of the circumstances facing the Deputy Sheriff Defendants on the morning of April 20, 1999, pursuant to *Lewis* and its progeny, Claim One may not be maintained.

It is beyond cavil that the Deputy Sheriff Defendants faced an unprecedented situation on the morning of April 20, 1999. As students lay wounded and dying outside the school, masses of students were running from inside where gunshots and explosions could be heard. Unlike a high-speed vehicle chase, the exact nature and extent of this criminal attack was unknown to the Deputy Sheriff Defendants. The decisions made by these Defendants in the first moments of the attack came under shocking, violent, and "rapidly evolving" circumstances leaving no opportunity for "unhurried judgments," "repeated reflection," or the "luxury of a second chance." *See Lewis* at 848, 852–53, 118 S.Ct. 1708.

Citing cases from foreign jurisdictions, Plaintiffs contend that the *Lewis* formulation is inapplicable, even to acts taken in an emergency situation, when the police officers had time to deliberate before performing the alleged unconstitutional act. *See e.g., Feist v. Simonson*, 222 F.3d 455, 464 (8th Cir.2000); *Helseth v. Burch*, 109 F.Supp.2d 1066 (D.Minn.2000) (*Helseth I*); *Schieber v. City of Philadelphia*, 1999 WL 482310 (E.D.Pa.1999). *Feist* and *Helseth I* were overruled in *Helseth v. Burch*, 258 F.3d 867 (8th Cir.2001) (*Helseth II*) and *Schieber* is distinguishable.

In *Feist* and *Helseth I*, cases involving high-speed police vehicle chases, the respective courts rejected the *Lewis* "intent to harm" standard because after the initial decision to give chase, the police officers had time to deliberate. *See Feist I*, 222 F.3d at 464; *Helseth I*, 109 F.Supp.2d at 1076. On appeal, the *Helseth II* court reversed the lower court's holding and overruled explicitly *Feist. See Helseth II*, 258 F.3d at 871. Relying in part on *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1155 (10th Cir.2001), the *Helseth II* court stated:

[T]o reject intent-to-harm as the governing standard whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had 'ample time to deliberate' ... produces a standard that eviscerates the holding of *Lewis* [.][I]t also gives too little recognition to the Court's other bases for that holding-*its historical reluctance "to expand the concept of sub-*

*stantive due process," ... [and] its recognition that police officers confronting high-speed lawlessness are "subject to countervailing [law] enforcement considerations" .... Lewis,* 523 U.S. at 855, 118 S.Ct. 1708.

*Id.* 870–71. (emphasis added). This conclusion is buttressed by *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) which adopted the intent-to-harm standard for a two-hour prison riot.

Plaintiffs also rely on *Schieber,* in which police officers failed to forcibly enter the apartment from which a woman's screams of help had been reported by neighbors. The next day, the woman was found dead on the floor of the apartment. Despite there being no evidence that the police had other immediate calls or that they had to leave the apartment building for any other reason, they spent less than five minutes at the scene. There, the officers had the opportunity but failed to truly deliberate. The Court did not apply the "intent to harm" formulation and allowed the § 1983 claim to proceed.

Under Plaintiffs' reasoning, law enforcement officers who take minutes rather than seconds to decide on a course of action, have the time deliberate. Thus, the "intent to harm" formulation applied in *Lewis* and *Radecki* would not, *per se,* apply. I disagree. [T]he measure of what is conscience shocking is no calibrated yard stick....' *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708. It "merely poin[ts] the way." *Id.* quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Likewise, I do not measure "conscience shocking" by use of a clock. Rather, I adhere to "an appraisal of the totality of facts" presented, *see Lewis,* 523 U.S. at 850, 118 S.Ct. 1708, to determine whether the Deputy Sheriff Defendants' actions shock the conscience of the court.

The Deputy Sheriff Defendants were faced with a volatile emergency situation the scope and nature of which was unprecedented. From the outset, the danger confronting the persons inside and outside of the school was extreme and remained so throughout the attack. These Defendants were required to make multiple, simultaneous decisions in a critically short period of time with no opportunity to "reflect" or "truly deliberate." *See Radecki,* 146 F.3d at 1232. Thus, *Scheiber* is factually distinguishable. Moreover, no Tenth Circuit or Supreme Court authority has narrowed the *Lewis* analysis in the manner sought by Plaintiffs.

In the context of the Columbine attack, as framed by the Plaintiffs' complaint, I conclude that the alleged actions by the Deputy Sheriff Defendants fail to shock the conscience of this court in the constitutional substantive due process sense. *See Lewis,* 523 U.S. at 852–53, 118 S.Ct. 1708; *Radecki,* 146 F.3d 1227. Plaintiffs have not met the fifth *Uhlrig* element.

To state a danger creation claim, Plaintiffs must meet all five *Uhlrig* elements. *See Uhlrig,* 64 F.3d at 574–75. Because Plaintiffs' allegations do not satisfy all five *Uhlrig* factors, the Deputy Sheriff Defendants are entitled to dismissal of Claim One.

**2. Claim Two Deprivation of Constitutional Right to Life, Liberty and Personal Security under 42 U.S.C. § 1983— Special Relationship—All Plaintiffs against the Deputy Sheriffs in their individual capacities**

Plaintiffs contend that, through the 911 operator, the individual Sheriff Defendants restrained the Library Plaintiffs from leaving the Library by instructing the Library Plaintiffs to stay in the library and await help. Therefore, according to Plaintiffs, pursuant to *DeShaney* the Deputy Sheriff Defendants stood in a "spe-

cial relationship" with the Library Plaintiffs giving rise to the constitutional duty to protect and care for them. *See id.* at 199–200, 109 S.Ct. 998. I disagree.

According to Plaintiffs, the 911 operator, through teacher Patti Nielson, was in telephone contact with the occupants of the Library. C/O ¶ 51. It is alleged that based on her training and/or responding to the direction of Sheriff Stone or the Deputy Sheriff Defendants, the 911 operator: 1) assured Ms. Nielson that paramedics, fire personnel, and police were en route (a true statement); and 2) instructed Ms. Nielson to "keep everyone low to the floor." *Id.* Ms. Nielson conveyed this information to the students in the Library, including the Library Plaintiffs. *Id.* at ¶¶ 53, 58. At the same time, the Deputy Sheriff Defendants prevented the Denver SWAT team and other potential rescuers from entering the Library. *Id.* at ¶ 54.

Allegedly, as a direct result of these communications, the Library Plaintiffs eschewed escaping through the open exterior library door. *Id.* at ¶ 53. Shortly thereafter, Harris and Klebold entered the Library and shot several students, including Evan Todd, Jeanna Park, and Valeen Schnurr. The Deputy Sheriff Defendants maintain that these allegations do not amount to restraint as contemplated by *DeShaney.* I agree.

As the *DeShaney* Court described:
[i]in the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, *or other similar restraint of personal liberty*-which is the "deprivation of liberty" triggering the protections of the Due Process Clause....

*DeShaney,* 489 U.S. at 200, 109 S.Ct. 998. (emphasis added). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament

or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.citing Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. 285.

I hold that the 911 operator's communications to those in the Library do not, as a matter of law, give rise to a special relationship as contemplated by the United States Supreme Court. The "restraint" here is in no way "similar" to incarceration or institutionalization. Nor did an affirmative duty to protect arise from the expressions of intent to help. Even assuming the falsity of the statement that help was on the way, there is no allegation that it was intentionally false. *See Uhlrig,* 64 F.3d at 575, n. 15. Although Tenth Circuit cases after *DeShaney* are distinguishable in some respects from this case, they do not alter the fundamental rule of the United States Supreme Court. *See Bryson v. City of Edmond,* 905 F.2d 1386 (10th Cir. 1990) and *Armijo.*

■ I also consider whether the individual Sheriff Defendants' alleged conduct giving rise to a special relationship with the Library Plaintiffs shocks the conscience of the Court. *See Radecki,* 146 F.3d at 1230 *citing Uhlrig,* 64 F.3d at 572–73. ("[T]he 'shocks the conscience'" standard applies to both ["'danger creation' and 'special relationship'] suits").

According to Plaintiffs, the "intent to harm" formulation is inapplicable because the individual Sheriff Defendants had ample time to deliberate. I disagree for the reasons set out in section VI(A)(1)(e). Accepting Plaintiffs' allegations as true and construing all reasonable inferences in their favor, *see Maher,* 144 F.3d at 1304 and *Dill,* 155 F.3d at 1201, the Deputy Sheriff Defendants' conduct is not conscience shocking in a constitutional sense. I conclude, consequently, that the Deputy

Sheriff Defendants are entitled to dismissal of Claim Two.

### 3. Claim Three–Failure to Provide Medical Assistance under 42 U.S.C. § 1983 by the Schnurr and Park Plaintiffs against the Unknown Deputy Sheriffs, in their individual capacity

The Schnurr and Park Plaintiffs bring Claim Three for failure to provide medical assistance based on the following allegations:

Within a minute or two after Harris and Klebold left the Library, Valeen Schnurr and Jeanna Park, along with the other students able to walk, escaped the Library through the exterior library entrance. C/O ¶ 59. Ms. Schnurr, who was seriously wounded and bleeding heavily, was assisted to the car of an unknown deputy sheriff who then told her to wait for the next car. C/O ¶ 60. Schoolmates then assisted Ms. Schnurr into a second unknown deputy sheriff's car. The second deputy sheriff then took Ms. Schnurr to a third unknown deputy sheriff's car. *Id.* This third unknown deputy sheriff handed Ms. Schnurr over to civilians driving a golf cart who transported Ms. Schnurr to a vehicle operated by a police officer. *Id.* This police officer recognized the seriousness of her condition and provided first aid until an ambulance arrived. *Id.* Ms. Schnurr lost a great deal of blood during the thirty (30) to forty-five (45) minutes she was required to wait for care. *Id.* Upon arrival at the hospital, medical personnel and attendants were unsure she would survive. *Id.*

Jeanna Park was assisted to a deputy sheriff's car by her sister Kathy Park behind which the sisters hid. *Id.* Thereafter, an unknown deputy sheriff took them to another area without administering first aid. Jeanna Park, the last of the wounded taken to a hospital, received no medical assistance from the Sheriff's Department during the time she waited for an ambulance. *Id.*

■ Pursuant to *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (state required to provide adequate medical care to prison inmates), *City of Revere,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (state required to provide adequate medical care to arrestees), and *Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir.1985) (arrestees), Defendants acknowledge that the United States Constitution requires them to provide adequate medical care to those citizens who are taken into police custody or otherwise restrained. *See* Opening Brief, pp. 28–29. In *Gregory v. City of Rogers,* 974 F.2d 1006, 1010 (8th Cir.1992), the Court held that "the Due Process Clause imposes a duty on state actors to protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." The guiding principle of *Gregory* and other similar cases is that, "when a state takes custody of a person, 'the Constitution imposes upon it a corresponding duty' for his protection." *See, e.g. Reed,* 986 F.2d 1122 *citing DeShaney,* 489 U.S. at 200, 109 S.Ct. 998.

■ I concluded earlier that the Deputy Sheriff Defendants did not take custody of the Library Plaintiffs through their communications relayed by the 911 operator and Ms. Nielson. It is alleged, however, that unknown Deputy Sheriff Defendants took custody of Ms. Schnurr and Ms. Park after their escape from the Library. They allege that unknown Sheriff Defendants moved them to various locations, allegedly without administering any first-aid despite their multiple gunshot wounds.

Under these circumstances, Claim Three as alleged states a claim against the unknown Deputy Sheriff Defendants for fail-

ure to provide medical care to Ms. Schnurr and Ms. Park.

**B. Construed Claims One, Two, and Three against the Municipal Defendants based on Inadequate Policies, Customs, and/or Training**

Claims One, Two, and Three allege that the conduct of the Deputy Sheriff Defendants violated the Plaintiffs' constitutional rights pursuant to policies or customs of the Jefferson County Board of County Commissioners and the Jefferson County Sheriff's Department and/or orders of Sheriff Stone, in his official capacity as policymaker for the Sheriff's Department. *See* C/O ¶¶ 70, 78, 84–85.

 In *Monell v. Department of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that:

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 695, 98 S.Ct. 2018. Liability does not attach to the governmental entity pursuant to § 1983 for the acts of its employees unless the Plaintiff can show: 1) that a municipal employee committed a constitutional violation; and 2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1317 (10th Cir.1998). The policy need not be formal or written. *Id.* at 691, 98 S.Ct. 2018. *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**1. Constitutional Violation**

As to Claim Three for failure to provide medical assistance, Plaintiffs have stated a claim for an underlying constitutional violation. Plaintiffs have not made the requisite predicate showing of an underlying constitutional violation as to Claims One and Two. Assuming, however, constitutional violations as to Claims One and Two, I assess the second element set out in *Myers* with respect to Claims One, Two, and Three.

**2. Policies, Procedures, Custom, or Training as Moving Force**

 A governmental entity or its policy makers may be liable pursuant to § 1983 if there is a failure to adequately train employees and that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Myers,* 151 F.3d at 1317. A governmental entity " 'is only liable when it can be fairly said that the city itself is the wrongdoer.' " *Collins,* 503 U.S. at 122, 112 S.Ct. 1061.

*Myers* illustrates this concept in the context of allegations of the use of excessive force by police officers in responding to a domestic violence incident. The *Myers* Court held:

> the plaintiffs' failure to train claims, like their basic excessive force claim against the individual officers, requires a predicate showing that the officers did in fact use excessive force....

*Myers,* 151 F.3d at 1317. *See also Trigalet v. City of Tulsa,* 239 F.3d 1150, 1156 (10th Cir.), *cert. denied,* ── U.S. ──, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001). It is only when the "execution of a government's policy or custom ... inflicts the injury" that the governmental entity or its policy

makers may be held liable under § 1983. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

 Here, Harris and Klebold were the "moving force" behind the Library Plaintiffs' injuries. Thus, Plaintiffs' allegations in Claims One, Two, and Three, as construed, do not state viable claims for municipal liability against the Jefferson County Board of County Commissioners, the Jefferson County Sheriff's Department, or Sheriff Stone, in his official capacity.

## VII.

### Qualified Immunity Analysis

 As a matter of law, qualified immunity is not available as a defense to municipal liability. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Plaintiffs have, however, cleared the initial hurdle of asserting a claim for a constitutional violation in Claim Three for failure to provide medical care but only as to unknown Sheriff Defendants. Because the defense is personal as to them and they have not appeared, I cannot address qualified immunity as to Claim Three. I have also found no constitutional violation as to Claims One and Two. Qualified immunity provides an additional reason why those claims must be dismissed.

The question is whether the constitutional rights allegedly violated were clearly established as of April 20, 1999 so that reasonable police officers in the Deputy Sheriff Defendants' position would have understood that their actions were in violation of those rights. *See Siegert,* 500 U.S. at 232, 111 S.Ct. 1789; *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 516 (10th Cir.1998).

In determining whether the law involved was clearly established, I examine the law as it was at the time of the individual Sheriff Defendants' actions. *Hilliard v. City and County of Denver,* 930 F.2d 1516,

1518 (10th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991). "[T]he plaintiff need not show that the specific action at issue has previously been held unlawful," he need only show that the alleged unlawfulness was apparent in light of preexisting law. *Id.* Ordinarily, for the law to be clearly established, there must be a Supreme Court or Tenth Circuit Court of Appeals decision on point, or the clearly established weight of authority from other circuit courts must have found the law to be as a plaintiff maintains. *See Medina,* 960 F.2d at 1498; *Morfin v. Albuquerque Public Schools,* 906 F.2d 1434 (10th Cir.1990).

It is a plaintiff's burden to convince the court that the law was clearly established. In doing so, a plaintiff cannot simply identify a clearly established right in the abstract and allege that a defendant has violated it. Instead, a plaintiff must make a particularized showing that the "contours" of the right are sufficiently clear that a reasonable state actor would understand that what he is doing violates that right. *See Patrick v. Miller,* 953 F.2d 1240, 1243 (10th Cir.1992) *citing Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. Although a "precise factual correlation between the then-existing law and the case at-hand is not required," *Patrick,* 953 F.2d at 1249, the alleged unlawfulness must be "apparent" in light of preexisting law. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. That is, it must be clear to a reasonable state actor that his conduct was unlawful in the situation confronted. *Id.* If a plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit. *Hilliard,* 930 F.2d at 1518. Hence, I look to whether it was clearly established in April 1999 within a sufficiently analogous factual setting that the particular alleged conduct of the Deputy Sheriff Defendants was grounds for a

§ 1983 violation based on the allegations in Claims One and Two. Pursuant to the allegations in Claim One, Plaintiffs must make a particularized showing that the "contours" of the state-created or enhanced danger doctrine under similar circumstances were clearly established on April 20, 1999. As to Claim Two, Plaintiffs must make a particularized showing that the contours of the special relationship doctrine were clearly established on April 20, 1999.

 The situation confronted by the Defendant Sheriff Deputies at Columbine on April 20, 1999 was horrific and unprecedented. The state created/enhanced danger and special relationship exceptions to the rule of *DeShaney* were clearly established. The contours of the rights flowing from these exceptions in the situation confronted were far from clear and provided no notice to reasonable officers that their conduct violated substantive due process rights.

*Graham, Uhlrig, Armijo,* and *Sutton* all provide reasoned support for the conclusion that the state created/enhanced danger theory does not fit the circumstances here. As to the special relationship theory, *Bryson,* 905 F.2d 1386 actually points away from liability. I have found no authority for the novel proposition that the 911 operator's statements to those in the Library were sufficient to establish custody as contemplated by *DeShaney* and its progeny. Indeed, *DeShaney,* the font of these exceptions, underscores their narrow strictures.

Even assuming Claims One and Two assert violations of substantive due process, qualified immunity necessarily attached because the contours of the rights were blurred and indistinct.

## VIII.

### State Law Claims

A. **Claim FourWillful and Wanton Conduct—All Plaintiffs against Deputy Sheriffs, individually, and Sheriff Stone, in his individual capacity**

The Deputy Sheriff Defendants and Sheriff Stone (Sheriff Defendants) move to dismiss Claim Four: 1) because it is barred by the Colorado Governmental Immunity Act (CGIA), Colo.Rev.Stat. § 24–10–103(4)(a); and 2) pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

1. **Colorado Governmental Immunity Act**

As an initial matter, the Sheriff Defendants contend that because Plaintiffs did not allege a specific factual basis for Claim Four, namely, the identity of the individual Sheriff Defendants who committed the alleged actionable conduct, as required by § 24–10–110(5), C.R.S. of the CGIA, this claim must be dismissed pursuant to Rule 12(b)(6).

Pursuant to § 24–10–110(5), adequate allegations are measured as follows:

(a) In any action in which allegations are made that an act or omission of a public employee was willful and wanton, *the specific factual basis of such allegations shall be stated in the complaint.*

(b) *Failure to plead the factual basis of an allegation* that an act or omission of a public employee was willful and wanton *shall result in dismissal of the claim* for failure to state a claim upon which relief can be granted.

*Id.* (emphasis added).

When there are disputed issues of fact, a well pleaded claim asserting that an employee acted willfully and wantonly must

await determination at trial on the merits. *City of Lakewood v. Brace,* 919 P.2d 231 (Colo.1996); *Barham v. Scalia,* 928 P.2d 1381 (Colo.App.1996); *Patel v. Thomas,* 793 P.2d 632 (Colo.App.1990). Whether a plaintiff has pleaded sufficient facts to state a claim based upon willful and wanton conduct, however, is a threshold determination to be made by the Court. *See Moody v. Ungerer,* 885 P.2d 200 (Colo. 1994); *Barham,* 928 P.2d at 1385–85; *Jarvis v. Deyoe,* 892 P.2d 398 (Colo.App.1994).

In Claim Four, Plaintiffs allege that the "Deputy Sheriffs" owed a duty to the Library Plaintiffs to protect them from Harris and Klebold. *See* C/O ¶ 91. Further, the "Deputy Sheriffs' acts, and failures to act, as described more fully above, . . . enhanced the danger to these plaintiffs posed by the armed and dangerous Harris and Klebold." *Id.* Plaintiffs allege also that "[t]he Deputy Sheriffs' duty to the [Library .Plaintiffs] arose from the Deputy Sheriffs' affirmative acts which induced these plaintiffs to remain in the Columbine High School library in reliance upon promises of immediate police assistance, rather than escape the [L]ibrary before Harris and Klebold arrived." *Id.*

### a. 911 Operator Statements

■ Claim Four is premised, in large part, on the statements made by the 911 operator to Ms. Nielson and conveyed to the Library Plaintiffs. Plaintiffs allege that "the Deputy Sheriffs and Stone did not order or effectuate an evacuation. Instead, the Deputy Sheriffs remained outside the library while *the 911 operator, based on her training and/or responding to the direction of Stone or the Deputy Sheriffs,* assured Ms. Nielson that help was on the way. . . ." C/O ¶ 51 (emphasis added). There are no allegations in Claim Four or elsewhere in the Complaint as to which, if any, of the Deputy Sheriff Defendants directed the 911 operator's words or what specifically, if anything, the Deputy

Sheriff Defendants told the 911 operator to say. Pursuant to § 24–10–110(5)(a)'s heightened pleading requirements, Plaintiffs' failure to name which, if any, of the Deputy Sheriff Defendants were responsible for the messages conveyed to the Library Plaintiffs requires Rule 12(b)(6) dismissal of the Deputy Sheriffs as to this portion of Claim Four. *See* § 24–10–110(5)(b).

■ As to Sheriff Stone, Plaintiffs allege:

> Sheriff Stone is liable for the Deputy Sheriffs' conduct because . . . the Deputy Sheriffs acted pursuant to his orders, pursuant to custom established by him and/or pursuant to polices (*sic*) promulgated by him. Sheriff Stone is also liable for the Deputy Sheriffs' conduct because he knowingly ratified their conduct by, *inter alia,* continuing to retain the Deputy Sheriffs as employees of the Sheriff's Department with full knowledge of, and notwithstanding, the Deputy Sheriffs' willful and wanton conduct as described above.

C/O ¶ 95.

As stated, the Complaint alleges that the 911 operator's communications were based on her training and/or Sheriff Stone's directions or the Deputy Sheriff's directions. *See* C/O ¶ 51. When ¶¶ 51 and 95 are read together, either Sheriff Stone himself directed the 911 operator's words or unnamed Deputy Sheriffs directed this conduct pursuant to Sheriff Stone's orders. *See* ¶¶ 51, 95. In either circumstance, Sheriff Stone's participation is pleaded with sufficient specificity.

### b. Training

■ With reference to the portion of Claim Four based on the 911 operator's training, it is not alleged which, if any, of the Sheriff Defendants was responsible for training the 911 operator. *See* ¶ 51.

Thus, pursuant to § 24–10–110(5)(a), Plaintiffs' failure to name which, if any, of the Sheriff Defendants were responsible for training the 911 operator, requires Rule 12(b)(6) dismissal of the Deputy Sheriff Defendants, including Sheriff Stone. *See* § 24–10–110(5)(b).

### c. Failure to Advise and Provide Assistance

▆ Plaintiffs also ground Claim Four on the Deputy Sheriff Defendants' failures to: 1) provide assistance to the Library Plaintiffs; and 2) advise the Library Plaintiffs that "no assistance would arrive and that these Plaintiffs must help themselves if they wished to avoid the imminent risk of serious bodily harm or death posed by Harris and Klebold." *See* C/O ¶ 92.

Plaintiffs allege that no assistance was provided by the Deputy Sheriff Defendants or other rescuers and that no advisement was made concerning the need for the Library Plaintiffs to help themselves. I may, therefore, infer that all of the Deputy Sheriffs Defendants failed to so act. Under these circumstances, § 24–10–110(5)(a)'s pleading requirements have been met as to this portion of Claim Four as to the Deputy Sheriff Defendants and Sheriff Stone. *See* ¶¶ 92, 95.

In summary, as to the 911 operator's communications to the Library Plaintiffs, the Deputy Sheriff Defendants are entitled to dismissal of Claim Four. For the reasons stated as against Sheriff Stone, the pleading requirements are met on that portion of Claim Four based on the 911 operator's communications. All Sheriff Defendants are entitled to dismissal of Claim Four based on the 911 operator's training. With respect to the alleged failures to act, the pleading requirements are met as to all Sheriff Defendants.

I further analyze the CGIA to determine if Claim Four in its entirety is barred as to all Sheriff Defendants.

The CGIA covers "all the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort." *Id.* at § 102. The term "public entity" is defined as "the state, county, city and county, municipality, school district ... and every other kind of district, agency, instrumentality, or political subdivision thereof organized pursuant to law." *Id.* at § 103(5). "Public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity." *Id.* at § 103(4). There is no dispute that the Sheriff Defendants are public employees under the CGIA.

A public employee may only be held liable for conduct that is willful and wanton:

> [a] public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment *unless the act or omission causing injury was willful and wanton.*

*Id.* at § 118(2)(a) (emphasis added). In any action alleging that an act of a public employee was willful and wanton, "the specific factual basis of such allegations shall be stated in the complaint." *Id.* at § 110(5)(a). The phrase "willful and wanton" is not defined in the CGIA. I look then to controlling Colorado case law to assess the conduct alleged here.

▆ In a companion case, *Castaldo v. Jefferson County Sheriff John C. Stone,* 2001 WL 1808538, —— F.Supp.2d —— (D.Colo.), I construed controlling Colorado court authority to mean that for a defendant's conduct to be "willful and wanton" under the CGIA that defendant must be

adequately alleged to have purposefully pursued a course of action or inaction that he or she considered would probably result in the harm to Plaintiffs. I apply that definition in the case as well.

Here, the Sheriff Defendants' alleged conduct involves the actions and omissions with respect to the 911 operator's communications and the Sheriff Defendants' failure to attempt to rescue the Library Plaintiffs as set out above. Also pertinent are Plaintiffs' allegations that upon arrival, Deputy Gardner saw several wounded students lying on the ground outside the school. *See* C/O ¶ 23. Almost immediately, Deputy Gardner saw either Harris or Klebold near the west entrance, approximately 30 feet east of the Library's exterior entrance. *Id.* at ¶ 24. This person fired several shots at Deputy Gardner with a long rifle and then entered the School through the west entrance. *Id.* Shortly thereafter, the other Deputy Sheriff Defendants arrived on scene and also learned that there were two shooters just inside the School's west entrance. *Id.* at ¶ 28.

■■■■■ Under circumstances where Harris and Klebold were just observed shooting at people directly outside the library's exterior entrance, the Sheriff Defendants' failure to attempt a rescue of the Library Plaintiffs through the exterior entrance and, in essence, telling them to stay put, does not, as a matter of law, amount to willful and wanton conduct. In addition, while the Sheriff Defendants' decision to "secure the perimeter" and not enter the School might in hindsight constitute negligence or arguably gross negligence, I conclude that the Sheriff Defendants' actions or omissions do not constitute willful and wanton conduct sufficient to abrogate governmental immunity under Colorado law. *See* Colo.Rev.Stat. § 13–21–102(1)(16); *Moody*, 885 P.2d 200; *Pettingell v. Moede*, 129 Colo. 484, 271 P.2d 1038 (1954). Consequently, I conclude Plaintiffs' Claim

Four is barred by the Colorado Governmental Immunity Act as to all Sheriff Defendants.

**2. Fed.R.Civ.P. 12(b)(6) Motion to Dismiss**

In the alternative, the Sheriff Defendants move to dismiss Claim Four on the grounds that there is no cognizable claim under Colorado law for failure to protect the Library Plaintiffs from Harris and Klebold. In response, Plaintiffs contend that the Sheriff Defendants owed a duty to the Library Plaintiffs to protect them from Harris' and Klebold's criminal acts. *See* C/O ¶ 91. In Plaintiffs' view, this duty arose from the special relationship that existed between the Sheriff Defendants and the Library Plaintiffs based on the Deputy Sheriff Defendants' acts and failures to act which enhanced the danger faced by the Library Plaintiffs. *See id.* I disagree.

■■■■■ Guiding principles have emerged from Colorado cases addressing whether police officers owe a duty to crime victims who are injured by third parties. Generally, there is no duty to prevent a third person from harming another unless a special relationship exists between the defendant and the wrongdoer or between the defendant and the victim. *Leake v. Cain*, 720 P.2d 152 (Colo.1986) *citing* Restatement (Second) of Torts § 315. *See also Solano v. Goff*, 985 P.2d 53 (Colo.App. 1999).

**a. Special relationship**

■■■■ Pursuant to *Leake* and its progeny, under Colorado law a special relationship giving rising to a legal duty of care has been confined to circumstances where: 1) a citizen, either perpetrator or victim, was in the custody or control of the police under circumstances giving rise to a duty of care, *Leake*, 720 P.2d at 163; 2) law

enforcement officers' actions created reasonable reliance on the part of the victims that the police would assist or protect them, *Whitcomb v. City and County of Denver*, 731 P.2d 749 (Colo.App.1986); or 3) there is a statutory duty of care; *see Leake*, 720 P.2d at 162; *Dare v. Sobule*, 674 P.2d 960 (Colo.1984). Plaintiffs assert no statutory duty of care.

### i. Custody or Control over Plaintiffs or Harris and Klebold

 Plaintiffs do not allege that the Sheriff Defendants had custody or control over Harris or Klebold. Thus, no special relationship existed between the perpetrators and the Sheriff Defendants. Nor did the Sheriff Defendants have custody or control over the Library Plaintiffs at the time Harris and Klebold entered the Library and attacked the students. *See* section VI(A)(2), above. Thus, there was no special relationship between the Library Plaintiffs and the Sheriff Defendants.

 As an additional basis, Plaintiffs contend that Deputy Gardner's deployment as a School Resource Officer created a special relationship with Plaintiffs and/or Harris and Klebold. I disagree for the reasons stated in companion 192 F.Supp.2d 1124.

### ii. Special Relationship based on Danger Enhancement

Plaintiffs state that a special relationship arose between the Sheriff Defendants and the Library Plaintiffs because these Defendants enhanced the risk faced by the Library Plaintiffs by: 1) maintaining a "secure perimeter" around the school preventing any rescue efforts; and 2) informing Plaintiffs that assistance was on the way and instructing Plaintiffs to remain in the Library.

 According to the Colorado Supreme Court, with respect to a state law tort claim a special relationship is created between the actor and a victim if the actor "induce[d] reliance or create[d] the peril or change[d] the nature of an already existing risk." *Leake*, 720 P.2d at 161. *See also Whitcomb v. City and County of Denver*, 731 P.2d 749, 751 (Colo.App.1986).

 Plaintiffs allege that the Denver SWAT team was present and could have evacuated all the students in the Library through an exterior exit after Harris and Klebold reentered the school's west entrance. This conclusion is belied by the Complaint's allegations. The allegation contained in C/O ¶ 22 and the accompanying diagram of the school demonstrates that the west entrance and the exterior library entrance were immediately adjacent to one another. Further, Plaintiffs allege that either Harris or Klebold shot several times at Deputy Gardner and then entered the west entrance of the school. Plaintiffs allege also that the Deputy Sheriff Defendants observed several wounded students on the sidewalk leading to the west entrance near the exterior entrance to the library. *See* C/O ¶ 26. Under these circumstances, I cannot conclude that the Sheriff Defendants enhanced or increased the risk that Harris and Klebold would attack the Library Plaintiffs.

 Plaintiffs allege further that the Sheriff Defendants, through the 911 operator, informed the Library Plaintiffs that help was on the way and instructed them to remain in the Library. As a result, the Library Plaintiffs remained in the Library and did not escape out the open exterior entrance door. C/O ¶ 53. Based on these allegations, the Sheriff Defendants induced the reliance of the Library Plaintiffs. Accordingly, I conclude that the Sheriff Defendants were in a special relationship with the Library Plaintiffs. *See Leake*, 720 P.2d at 161.

### a. *Solano* Factors

In *Solano*, 985 P.2d 53, the Court listed factors to be examined to determine the existence of a duty in situations where special relationships exist: 1) the foreseeability of harm to others; 2) the social utility of the defendant's conduct; 3) the magnitude of the burden of guarding against injury or harm; and 4) the practical consequences of placing such a duty upon the police. *Id.* at 54.

In *Solano*, the Court concluded that the county sheriff owed no legal duty to the surviving heirs of a man murdered by an inmate who had escaped from the county jail. *Solano*, 985 P.2d 53. In determining that no duty of care existed, the *Solano* Court assumed the existence of a special relationship between the sheriff and the inmate. This was but the threshold consideration. The Court then analyzed and balanced each of the other factors before concluding that there was no legal duty.

### i. Foreseeability of Harm

Defendants do not contest that there was a foreseeable risk of harm to the Library Plaintiffs. I agree.

The question of foreseeability " 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.' " *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48 (Colo.1987) *quoting* 3 F. Harper, F. James, & O. Gray, The Law of Torts § 18.2 at 658–59 (2d ed.1986). Foreseeability is based on common sense perceptions of the risks created by various conditions and circumstances. *Solano*, 985 P.2d at 54 *citing Taco Bell*, 744 P.2d at 48. *See also*, Restatement (Second) of Torts § 289 (1965).

While important, foreseeability alone does not establish the existence of a legal duty. *Solano*, 985 P.2d at 54; *Perreira v. State*, 768 P.2d 1198 (Colo.1989); *Taco Bell*, 744 P.2d at 49; *Restatement (Second) of Torts* § 344, comment f (1965).

### ii. Social Utility of Law Enforcement

The second factor is the social utility of the Sheriff Defendants' conduct. In assessing this factor, the appropriate inquiry is to assess the social utility of the Sheriff's Department function and purpose as a whole. *See Davenport v. Community Corrections*, 962 P.2d 963, 968–69 (Colo.1998) (Court considered function and purpose of community corrections as a whole, including such aspects as sentencing options, rehabilitation prospects, positive impact on victim restitution, and fiscal savings).

The social utility of the Sheriff's Department's function and purpose and, by extension, the Sheriff Defendants and the 911 emergency telephone system, is high. Their mission, collectively, is to keep the peace to the best of their abilities and to protect the public so that the citizenry can live and work in a relatively safe world. *See Solano*, 985 P.2d at 55. In this case, imposition of a duty would undermine the Sheriff's Department's high social utility by establishing a real disincentive to provide emergency law enforcement services, including the 911 emergency communications system, thus reducing significant benefits provided to the community at large. This factor weighs against imposition of a duty.

### iii. Magnitude of the Burden of Guarding against Injury or Harm

The Sheriff Defendants view the burden of imposing a duty on them based on the 911 operator's statements as immense because "law enforcement officers would essentially have a special relationship in all cases where 911 calls were made." *See* Opening Brief, p. 46.

The Sheriff Defendants' burden is not as onerous as they describe. Here, the 911

operator's communications to the Library Plaintiffs allegedly were false. Although the Complaint characterizes the communication as "false" it cannot be construed to allege that the communications were *intentionally false*. Fairly construing the Complaint, it can be seen that the communications were inaccurate and misleading. It is not an undue burden to expect 911 operators to provide accurate information to callers. Thus, the determination whether a legal duty exists remains a case specific inquiry. *See Taco Bell, Inc.*, 744 P.2d at 46. Although this factor could be seen to be in equipoise, I will weigh it in favor of imposing a duty on the Sheriff Defendants.

### iv. Practical Consequences of Imposing a Duty

As discussed in *Solano*, imposing liability on the individual Sheriff Defendants for the conduct of third parties who have no history of violent acts would render law enforcement officers insurers for such conduct. This would have inevitable negative consequences for all aspects of police work including their management of emergency situations. Indeed, the spectre of personal liability in the exigent circumstances here creates a disincentive to provide emergency 911 and response services. Because these consequences would detrimentally affect the public, this factor weighs against imposing a legal duty.

On balance, consideration of the relevant factors under the circumstances alleged here, leads to the conclusion that imposition of a legal duty on the Sheriff Defendants is not warranted.

### B. Claim Five–Outrageous Conduct—against individual Deputy Sheriffs and Sheriff Stone, in their individual capacity

■ The elements of liability for the tort of outrageous conduct are that: 1) the defendant engaged in extreme and outra-

geous conduct; 2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and 3) the defendant's conduct caused plaintiff to suffer severe emotional distress. *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994), *Floyd v. Coors Brewing Co.*, 952 P.2d 797 (Colo.App.1997); CJI–Civ. 4th 23:1 (2000).

■ Proof of the tort of outrageous conduct under Colorado law must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the decisive conclusion is that infliction of severe mental suffering was calculated or recklessly or callously inflicted on the plaintiff. *Gard v. Teletronics Pacing Sys., Inc.*, 859 F.Supp. 1349, 1354 (D.Colo. 1994). The conduct must be so outrageous and extreme, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *See Floyd*, 952 P.2d at 804; *Davies v. Philip Morris, USA*, 863 F.Supp. 1430, 1440 (D.Colo.1994). It is the Court's responsibility, as an initial matter, to determine whether reasonable persons could differ on the question. *Floyd*, 952 P.2d at 804; *Culpepper*, 877 P.2d at 883.

■ Harris' and Klebold's acts in perpetrating their heinous and horrific attack on the Library Plaintiffs were, without doubt, atrocious. However, where as here, the Sheriff Defendants were confronted with an unprecedented and rapidly evolving violent situation, reasonable persons could not conclude that the Sheriff Defendants's conduct was so extreme in degree, as to be "atrocious" and "utterly intolerable." *See Floyd*, 952 P.2d at 804. Therefore, Defendants are entitled to dismissal of Claim Five.

Accordingly, IT IS ORDERED that:

1. Claim One against all Defendants is DISMISSED;

2. Claim Two against all Defendants is DISMISSED;

3. Claim Three against Sheriff Stone, the Jefferson County Board of County Commissioners, and the Jefferson County Sheriff's Department is DISMISSED;

4. Claim Four against the Deputy Sheriffs and Sheriff Stone is DISMISSED; and

5. Claim Five against the Deputy Sheriffs and Sheriff Stone is DISMISSED.